## APPEAL OF EDWIN SCHIELE DISTILLING CO.

Docket No. 3521.   Submitted November 23, 1925.   Decided February 18, 1926.

> To be included in statutory invested capital, intangible assets paid in for stock must have actual cash value when so paid in.

*A. M. Frumberg, Esq.*, for the taxpayer.
*Briggs G. Simpich, Esq.*, for the Commissioner.

Before STERNHAGEN, LANSDON, and ARUNDELL.

This appeal is from the determination of a deficiency in income and profits taxes for the years 1918 and 1919, in the amount of $37,858.54. The taxpayer alleges that the Commissioner erred in disallowing value of intangibles in the computation of invested capital and as a basis for determining loss resulting from national prohibition legislation.

### FINDINGS OF FACT.

The taxpayer is a Missouri corporation, with its principal office in St. Louis. It was incorporated on June 28, 1907, with an authorized capital of $250,000, divided into 2,500 shares of the par value of $100 each. Fifty per cent of the authorized capital was common stock, and 50 per cent was preferred stock, with provisions for cumulative dividends at the rate of 7 per cent per annum, and with no voting power. At the date of incorporation, taxpayer acquired all the tangible and intangible assets of Edwin Schiele & Co., a partnership, and paid therefor to the partners of such company its common and preferred stock in the amount of 1,925 shares. Of this payment, 1,460 shares were for tangibles and 465 shares were for intangibles. A small number of shares were subscribed for by others than the partners, at the date of incorporation, at $100 a share.

Edwin Schiele & Co., hereinafter referred to as the partnership, was established in 1892, for the purpose of dealing in whisky at wholesale. It was its practice to buy whisky in large quantities, in barrels, and to then bottle portions of such bulk whisky for sale

to the liquor trade under its own trade-marks, brands, and labels. Prior to June 20, 1907, it had established eight such trade-marks or brands and registered the same in Mida's Trademark Bureau. It had also registered one of its brands, " Autocrat," in the United States Patent Office.

The partnership expended large sums of money in advertising its trade-marked whisky. For the years 1903, 1904, 1905, and 1906, such expenditures were made in the amount of $38,578.02. Prior to 1903, approximately $100,000 had been so spent. The effect of such advertising was to create a demand for the trade-marked whisky at prices that averaged at least 25 per cent higher than could be obtained for the same goods when sold in barrels without any distinguishing trade names or labels. At June 28, 1907, the partnership enjoyed a large patronage and its business was profitable.

From 1903 to 1906, inclusive, the financial statements of the partnership, as of January 1 of each of such years, show the following :

| Year. | All tangible assets. | Net worth of tangibles. | Net earnings. |
|---|---|---|---|
| 1903 | $166,453.55 | $96,103.55 | $16,994.64 |
| 1904 | 221,725.26 | 111,205.44 | 9,670.90 |
| 1905 | 246,409.58 | 113,881.83 | 11,271.74 |
| 1906 | 253,429.17 | 120,778.44 | 16,612.61 |
| Average | 221,754.54 | 110,492.31 | 13,637.49 |

Salaries for services rendered in the operation of the business were paid in equal amounts to the two partners, Edwin Schiele and David Kriegshaber, for the years 1903, 1904, 1905 and 1906, or in the total amount of $29,400 for the four years. During the same years the partnership used tangible assets in its business operations in the total annual average amount of $236,251.64, of which $125,759.33 was borrowed capital, for which interest was paid in the average annual amount of $6,757.83, at the rate of approximately 5 per cent.

In its income and profits tax returns for the year 1917, the taxpayer included in its invested capital the amount of $65,462.32, alleged to represent value of intangible assets acquired by it from the partnership at June 28, 1907, in exchange for 460 shares of its preferred stock, but in its appeal it asks that only $46,500 of the value of such intangibles be included in its invested capital. In its returns for 1918 and 1919, the taxpayer deducted certain amounts, not disclosed by the record, from its gross income for such years, as losses due to obsolescence of its intangible property resulting from national prohibition legislation. Upon audit of such returns, the Commissioner advised the taxpayer, "That no good-will value can be computed either as at the date of incorporation, for invested capital purposes, or as of March 1, 1913, for obsolescence," and determined

the deficiences for 1918 and 1919 that are in controversy in this appeal.

DECISION.

The determination of the Commissioner is approved.

OPINION.

LANSDON: The issues of this appeal grow out of the taxpayer's contentions that, when incorporated at June 30, 1907, it acquired intangible assets from a predecessor partnership, which, at that date, had a value of not less than $46,500; and that it had intangible assets of substantial value at March 1, 1913, which should be made the basis for computing deductions from gross income of the years 1918 and 1919, on account of obsolescence resulting from prohibition legislation. The evidence is conclusive that stock of the par value claimed was issued for intangibles at the date of incorporation. The taxpayer asserts that, if intangible property of the value alleged was paid in for capital stock, such value must thereafter be included in its invested capital for the purpose of determining its liability for profits taxes and as a basis for obsolescence of intangibles resulting from national prohibition legislation. Intangibles of the nature involved in this appeal are property, and, if the value of such property at the date it was paid in for stock is established by competent evidence, the taxpayer's theory is sound as to the first point asserted, without in any way affecting the basis for the computation of obsolescence of intangibles resulting from prohibition legislation, which must depend on proved value as of March 1, 1913. Invested capital for excess-profits tax purposes is a creature of statutory definition. Obsolescence relates to matters of fact that must be established by competent evidence.

The taxpayer, to sustain its contention, must prove that the specified intangibles were *bona fide* paid in for stock at June 28, 1907, that, on that date, they had an actual value of not less than $46,500, the par value of the stock received therefor, and that no statutory provisions can be applied to reduce such value as an element of invested capital. In support of its contention of value, it relies (1) on the fact that shares of stock of the par value of $46,500 were issued in exchange for such intangibles and that some sales of such stock were made at par; (2) on proof that large sums of money, aggregating something like $150,000, were spent in advertising for the purpose of creating a commercial demand for the merchandise bearing its labels, trade-marks and trade names; and (3) that the application of A. R. M. 34 to the tangible assets and the net earnings of the partnership for the years 1903, 1904, 1905, and 1906,

proves that the intangible assets had value in the amount of $50,056.35 at January 1, 1906.

The Board does not agree with the taxpayer's contention that the value of the intangibles paid in for stock may be determined by the few sales of shares made at par on or about the date of incorporation. It is true that some shares were so sold, but for the most part such sales were to the partners, to persons closely associated with them, or to persons from whom the partnership had borrowed money and were, in fact, original subscriptions for stock of the corporation then in process of organization rather than sales to the public. None of the sales was on an open market or of such a nature as to establish a market value of the stock at $100 per share.

The taxpayer proved that the partnership expended large amounts for advertising, but there is nothing in the evidence to indicate that such expenditures produced results that may be reduced to terms of dollars and cents for inclusion, even in part, in the capital structure of the partnership. The only proved effect of the advertising is the testimony of one of the partners that the partnership sold trade-marked brands of whisky in bottles for prices about 25 per cent higher than those obtained for the same merchandise marketed in bulk. During the entire life of the partnership, the cost of all advertising was charged to expense. Whether such expenditures resulted in the development of intangible values is a matter of fact that is best determined by a scrutiny of the financial statements which reflect the income of the partnership for the years involved.

The parties agree on the amounts representing tangible assets and total earnings for the years 1903 to 1906, inclusive, but differ widely on the results obtained by the application of the formula suggested in A. R. M. 34 to such amounts for the purpose of ascertaining value of good will. The taxpayer contends that, for any given period, all the net earnings of a partnership, including any amounts paid to partners as salaries, must be regarded as profits, and that such profits must be attributed in their entirety to the earning power (1) of the net worth of the tangible assets, and (2) of the intangible assets. Counsel for the Commissioner contends that reasonable salaries paid to partners for services rendered in the operation of the business must be deducted from earnings before the formula can be applied, and that the total value of the tangible assets, regardless of the debts of the partnership, must be considered. The application of the formula, as interpreted by the taxpayer, indicates that intangible property of the value of $50,056.35 at January 1, 1907, was paid in for stock at June 28, 1907. The Commissioner's interpretation and application of the formula to the same amounts indicates that such intangibles had no value at either of such dates.

The taxpayer's assumption that all the earnings are attributable either to tangible or intangible property invested in, at risk, and used in the business is not sound. If any intangible property is employed in the business operations of a partnership, the net earnings must be attributed to at least three factors—tangible assets, intangible assets, and the services of the partners who devote their time and minds to the business. To determine the earning value of the intangibles, a proper portion of the net returns must first be attributed and allocated to the other two income-producing elements. In the instant appeal, there is no controversy over the value of the services rendered by the partners. By agreement between themselves they fixed their own salaries, and, in the absence of controversy, the amounts so determined and paid must be accepted as the measure of their personal contributions to the income of the partnership and deducted from earnings before any allocation of profits can be made either to tangibles or intangibles.

Even after reducing the earnings by the amounts attributable to the personal services of the partners, we are still unable to make any proper allocation of the remaining profits, without considering the additional element of borrowed capital. The record discloses that all borrowed capital involved in this issue is tangible property. It must be presumed, therefore, that, equally with tangible assets representing paid-in capital, it is entitled to a reasonable annual return for its services. In the case of breweries and distilleries, the Commissioner has suggested that 10 per cent is such a return. In the instant appeal, the cost of borrowed capital was 5 per cent per annum, which, if 10 per cent is allocated to tangibles, indicates a net gain of 5 per cent as the result of its use. The average amount of borrowed capital employed by the partnership for each of the years 1903 to 1906 was $125,759.33, and its average annual net earnings at 5 per cent was $6,287.46, or a total for the four years involved of $25,149.84.

If the taxpayer's contention that 10 per cent shall be attributed only to the net worth of the tangibles, without considering the net income resulting from the use of borrowed capital, is sustained, the earnings attributable to intangibles will be increased in the annual average amount of $6,287.46. On the other hand, if 10 per cent per annum is first attributed to the gross annual average value of the tangibles, without any adjustment for bills payable, the result so obtained will be too large by the exact net amount earned by the tangibles that represent borrowed capital. The taxpayer's calculation increases the amount of earnings attributable to intangibles, and the Commissioner increases the amount attributable to tangibles.

The correct amount of earnings attributable to intangibles, in the conditions of this appeal, can be found only by subtracting from the

total net earnings (1) salaries paid to the partners, (2) the net earnings of borrowed capital, and (3) a reasonable return on owned assets. Using the amounts set forth in our findings of fact, the following computation determines the value of intangibles paid in for stock when this taxpayer was incorporated, if such value can be ascertained by the use of the suggested formula:

| | | | |
|---|---|---|---|
| Findings | (1) | Total earnings 1903 to 1906, inclusive_____ | $83,949.95 |
| Findings | (2) | Salaries paid partners same period_____ | 29,400.00 |
| (1)−(2) | =(3) | Earnings of all assets_____ | 54,549.95 |
| Findings | (4) | Net earnings of borrowed assets_____ | 25,149.84 |
| (3)−(4) | =(5) | Earnings of net worth of all assets_____ | 29,405.31 |
| ¼ of (5) | =(6) | Average yearly earnings of all assets_____ | 7,351.33 |
| Findings | (7) | Average net worth of tangibles_____ | 110,492.31 |
| 10% of (7) | =(8) | Annual earnings attributable to tangibles_____ | 11,004.92 |
| (6)−(8) | =(9) | Attributable to intangibles_____ | Nothing. |

Inasmuch as the basis for the computation of obsolescence for any year subsequent to March 1, 1913, is value at that date, the Commissioner suggested that careful consideration should be given to the question of the value, if any, of the taxpayer's intangible assets at March 1, 1913. As we have found that the intangibles acquired by the taxpayer at the date of incorporation were without value as property paid in for stock or shares, it is obvious that any good will or other intangibles owned by it at March 1, 1913, must have been paid in or otherwise acquired subsequent to incorporation, and should appear on the balance sheets of the taxpayer either as earned or paid-in surplus. During the last five years of this period the taxpayer's business operations resulted in net losses that aggregated $46,591.55 at December 31, 1912. The evidence adduced is conclusive that no good will or other intangibles of value were developed or acquired between June 28, 1907, and March 1, 1913.

The Board is of the opinion that the taxpayer has failed to establish any value for intangibles alleged to have been paid in for stock in the amount of $46,500 at June 28, 1907, and that at March 1, 1913, it owned no good will or other intangibles that could be used as a basis for obsolescence. It follows, therefore, that the Commissioner's refusal to include any value of intangibles in the taxpayer's invested capital for 1917 and subsequent years, either for profits-tax purposes, or as basis for computing obsolescence due to national prohibition legislation, must be approved.