G. R. KINNEY COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 31397, 32980. Promulgated October 4, 1932.

*Paul Armitage, Esq.*, and *Edward Holloway, Esq.*, for the petitioner.

*Harold Allen, Esq.*, and *L. H. Rushbrook, Esq.*, for the respondent.

'OPINION.

SEAWELL: In the petitions and amended petitions filed in these proceedings, various errors were assigned, but at the hearing a stipulation was submitted as to all of the issues raised in Docket No. 32980 except that relating to the allowability of certain good will for invested capital purposes. The agreements as reached are incorporated herein by reference and will be given due effect by the parties when a computation is made under Rule 50.

The issue as to invested capital arises in this manner: The petitioner is the successor to a chain-store shoe business which was started in 1894 as a partnership. From the one store with which the business began it had increased by 1917, when the petitioner was organized, to 48 stores. Each store was a separate partnership, though G. R. Kinney, the founder of the business, was a partner in each store and

each store was conducted under the same name. Many of the individuals connected with the enterprise were partners in more than one store. In January, 1917, the business was incorporated under the name of the petitioner and all assets, both tangible and intangible, were transferred to the petitioner. While the record does not specifically show the assumption of liabilities of the partnership by the petitioner, as we understand the situation such was the case; that is, there was a true instance of succession of the partnerships by a corporation in which all assets of the partnerships were transferred to the corporation and all liabilities of the partnerships were assumed by the corporation, and the corporation issued its stock to the partners for their several interests in the assets. While the amount of preferred stock authorized was in the amount of $1,500,000, all of it was not issued upon organization of the petitioner, but a smaller amount at par represented by the net value of the tangible assets of the partnerships in the amount of $901,692.27. When the remaining preferred stock was issued does not appear and there is nothing in the record to show that other than the foregoing amount was outstanding at March 3, 1917. Twenty-five thousand shares of common stock of no par value were issued for the intangible assets of the partnerships.

The controversy arises as to whether an amount may be included in invested capital and, if so, how much, on account of the acquisition of the good will of the partnerships through the issuance of common stock therefor. In the first place, it is suggested by the Commissioner that even though the petitioner was organized on January 23, 1917, and stock at that time issued for the assets of the partnerships in accordance with an agreement between the partners and the petitioner, the transaction would be considered as having occurred after March 3, 1917, and therefore coming within the provisions of section 331 of the Revenue Acts of 1918 and 1921, since certain formal bills of sale for the transfer and conveyance of the property were not executed until July 1, 1920. That is, the Commissioner suggests that no good will is allowable, since the conveyance of assets occurred after March 3, 1917. We can not agree with this contention. The corporation was not only organized on January 23, 1917, but stock was issued at that time for the assets of the partnerships, such issuance of stock being in conformity with agreements between the parties. The petitioner operated the business from the date of organization through the years in controversy and exercised every evidence of full and complete ownership of the assets. G. R. Kinney, the founder and moving spirit in the business, died in 1919 and we have little evidence as to the reason for the delay in the execution of the bills of sale, but the record as a whole convinces us that such execution was merely a

formal matter which was carried out to complete the record as to something which actually occurred at the date of the organization of the petitioner.

Since we are of the opinion that the transaction represented the acquisition of assets prior to March 3, 1917, in which common stock was issued for the intangible assets of the partnerships, our question as to the amount allowable in invested capital on account of the acquisition of intangibles is governed by section 326 (a) of the Revenue Acts of 1918 and 1921, which reads in part as follows:

That as used in this title the term "invested capital" for any year means * * *:

\* \* \* \* \* \* \* \*

. (4) Intangible property bona fide paid in for stock or shares prior to March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding on March 3, 1917, whichever is lowest.

In the first place, the Commissioner states in his brief that " The evidence shows that the common stock issued for the intangibles was of no par value, therefore, not any amount could be included under subsection b." This argument, however, overlooks section 325 (b) of the Revenue Acts of 1918 and 1921, which provides that:

(b) For the purposes of this title, the par value of stock or shares shall, in the case of stock or shares issued at a nominal value or having no par value, be deemed to be the fair market value as of the date or dates of issue of such stock or shares.

Since we are satisfied that the stock had a fair market value, as will be shown below, the limitation under subsection (b) will be based upon such fair market value.

The question presented to which the evidence was largely directed was the limitation provided by subsection (a) (section 326, *supra*), namely, the cash value of the good will at the date paid in. It is contended by the petitioner that the good will had a value at the date of organization of at least $3,000,000. In the first place, various computations are made, based upon a capitalization of earnings, and these computations show amounts which the petitioner would have us adopt as the value of good will at the date of organization, ranging from $2,353,637 to $5,964,544.80. In making such computations the petitioner used 8 per cent as a fair return on net tangible assets and capitalized the excess of earnings over such return at various rates from 5 to 12 per cent. Various combinations of earnings were used, including the earnings for the five years set out in our findings as well as the three years subsequent to the organization of the petitioner. The Commissioner objects to the computations on the ground of the capitalization rates, the use of

net rather than gross tangibles, and the correctness of the figures used to show earnings and net tangible assets. In fact, the Commissioner says that instead of using the average earnings for the five years preceding incorporation of the petitioner and those of the three years succeeding its organization, as proposed in one of the petitioner's computations, a more nearly correct result would be obtained by taking a 10-year period—five years before and five years after organization of the petitioner. While the petitioner earned substantial profits for the three years succeeding its organization, it sustained large losses in the fiscal year ended January 31, 1921, and the 11-month period ended December 31, 1921, and consequently, when a computation is made as suggested by the Commissioner, no excess earnings remain on which an intangible or good will value might be predicated. We have not set forth the earnings subsequent to the organization of the petitioner nor will we attempt to comment on all of the computations submitted, since we can not see that any useful purpose would be served thereby. Suffice it to say that we are not convinced that the large values computed by the petitioner are supported by the record. If we take the average annual earnings and average net tangible assets for the 5-year period preceding 1917, as compiled from statements prepared by George R. Kinney, as a basis for settlement with the partners, and compute a return of 8 per cent on net tangible assets and capitalize the excess earnings at 15 per cent, which is most favorable to the petitioner, a value for intangibles would be shown of only approximately $900,000. The foregoing rates are often used as an aid to fixing the value of intangibles where we are concerned with a very stable and long established concern. Here we have a well established business, but we can not overlook the fact that the greater part of tangible assets is represented by inventories which are subject to the rise and fall of commodity prices. In fact, during the period of rising prices during the war the petitioner showed large profits, whereas when prices declined after the war very substantial losses were sustained. Under such circumstances higher capitalization rates would seem to be justified, which in turn would mean a reduction in the intangible value as computed above.

We have further the objection of the Commissioner to the accuracy of the figures which form the basis of all of the computations. Very incomplete records were maintained by George R. Kinney for the several partnerships and some of the records were lost. What the petitioner presented was secondary evidence in the form of annual statements which were prepared by Kinney as a basis for annual settlement with the partners. While we are not convinced of their absolute accuracy, we are of the opinion that whatever

inaccuracies may exist therein would not materially alter a computation of the kind here proposed. In the next place, the Commissioner objects to the use of net, rather than gross, tangibles as a basis for the capitalization of earnings. As pointed out in *Edwin Schiele Distilling Co.*, 3 B. T. A. 873, neither net nor gross tangibles may be unqualifiedly used where we are seeking to determine a proper return on tangible assets before allocating any excess earnings to intangibles. In other words, if in a given case a taxpayer has a large amount of borrowed capital on which it is paying interest at the rate of say 6 per cent, it would obviously be inaccurate to compute a return on either gross or net tangibles at a different rate, say 8 or 10 per cent, without making proper adjustment for the tangible assets which are represented by borrowed money. In the case at bar a substantial amount of borrowed capital is involved, as is evidenced by the differences between the amounts of the gross and net tangible assets, but we do not know the interest rate paid on borrowed money and therefore we are in no position to make the necessary adjustment as between a capitalization return on tangible assets and the income derived and interest paid on borrowed money. The most that we can say is that apparently the correct result, on a capitalization basis and if we should use rates of 8 per cent and 15 per cent, would be an amount less than $900,000 as shown from the computation referred to above and more than approximately $600,000 which would follow in a similar computation by the use of gross rather than net tangibles.

We have referred to the figures submitted on a capitalization basis not only because of what might be indicated as to value by the use of such a method, but also because much of the opinion evidence has a similar foundation. In the first place, we have the opinion of E. H. Krom, president of the petitioner and who has been connected with the business since shortly after its organization in 1894. He placed a cash value on the good will at the date of organization of the petitioner of $2,500,000, but an examination of his testimony would indicate that this expression of opinion is predicated to a large extent on the distribution of 25,000 shares of no par common stock to the partners on the basis of the earnings of the several stores. The method followed in distributing the common stock was to take the earnings of each store for 1916, deduct from such earnings a return of 8 per cent on the net tangible assets at the date of organization of the petitioner as the amount of dividends on the preferred stock, and then capitalize the remaining earnings at approximately 9.15 per cent. It is argued that the result reached, namely, a valuation of $2,500,000, is entitled to much weight because it was the result of bargaining among the partners where each was seeking to obtain

the most possible for himself and at the same time not allow another to gain an undue advantage, and therefore a fair value was reached. We do not think such a result necessarily follows. The result may be equitable in the sense that each retains the same proportionate interest, but we can not say it necessarily fixes the cash value of the good will. The letter to the partners at the time of negotiations for the organization of the petitioner, a part of which we quoted in our findings, stated that the distribution of the common stock on the basis of earning capacity would enable each partner to receive an " equitable distribution of the common stock," but this is a long way from saying that the method used fixed the value of the intangibles for which the common stock was issued. Obviously, an equitable distribution could have been made with a smaller as well as with a larger number of shares. Krom testified that the common stock had a value in 1918 and 1919 equal to that in 1917, which he stated was $2,500,000, yet on the estate-tax return of G. R. Kinney, filed on August 10, 1920, fixing the value of common stock held by Kinney at his death on June 17, 1919, the value fixed was $5 per share. Krom signed the return as one of the executors. Of course he now says that such valuation was fixed without having given proper consideration to the value of the intangible assets for which the stock was issued, but where such a great disparity exists we can hardly be expected to accept the present statements of opinion at their face value without better explanation for the great variation between the two amounts.

Two further witnesses testified as to a cash value for the good will at the date of the organization of the petitioner of $2,500,000 to $3,000,000. Both witnesses had been familiar with the business for many years, but we are not convinced of the soundness of their valuations. One of them, Lord, based his valuation on a capitalization of the earnings of the partnerships for 1916 at 12½ per cent, while the other predicated his valuation largely on an investigation which he made for a corporation with which he was connected for the purpose of a merger or consolidation with petitioner. Not only did the latter event occur in 1919, but also the investigation seems to have had for its main purpose a determination of what would be a fair ratio for an exchange of stock of the petitioner for stock of the corporation which the witness represented. Again, as we stated in regard to the testimony of Krom, what is an equitable basis for distributing stock among stockholders and what is a cash value for the assets back of the stock may represent such different considerations that the existence of one may not be helpful in proving the other. By the foregoing we do not mean that the testimony of the witnesses as to value is to be disregarded; on the contrary, we have considered it

very carefully. From it, and the evidence offered as to the history of the business as reflected by its growth and substantial earning power, we are convinced there was a good will of substantial value which had been built up and for which the common stock was issued. In our opinion, its cash value is reasonably determinative in the amount of $600,000 and we so find.

But this does not dispose of our question as to the good will allowable for invested capital purposes. We have two further tests to be applied, one of which is the par value of stock issued for the intangibles in question. As we have heretofore stated, the stock was without par value and therefore this limitation would be applicable on the basis of fair market value of the stock issued therefor. (Section 325 (b) of the Revenue Acts of 1918 and 1921.) The stock in question was the 25,000 shares of no par common stock to which we have been referring in our previous discussion. It was unlisted and apparently the sales were confined to empoyees and stockholders of the petitioner. The first sale we have shown in the record is at $25 per share in 1919 and the same price prevailed through 1920. We have further the testimony that the stock was worth at least as much in 1919 as at the date of the organization of the petitioner, and the foregoing is further confirmed by evidence to the effect that the earnings of the petitioner continued to increase through 1917, 1918, and 1919. We have fixed a value for the intangibles for which the stock was issued of $600,000, which would reflect an asset valuation of slightly less than $25 per share. We are accordingly of the opinion that for the purpose of the limitation prescribed by subsection (b) the fair market value of common stock may be fixed at $25 per share.

We now come to apply the limitations provided by section 326 (a) (4), *supra*, and determine the amount of good will allowable as the smallest of the following amounts: (a) The actual cash value of the good will at the time paid in, which we have fixed at $600,000; (b) the par value (here fair market value) of the stock issued for such property, fixed for that purpose at $625,000; and (c) 25 per centum of the par value of the total stock of the petitioner outstanding on March 3, 1917, $381,675, that is, 25 per cent of ($901,700 [par value of preferred stock issued for tangible assets] plus $625,000 [fair market value of no-par common stock issued for intangible assets]). In determining the amount allowable under subsection (c) we have used as the par value of preferred stock outstanding the net tangible assets of the partnerships on January 23, 1917. Since there was no controversy as to the invested capital allowable on account of property paid in for preferred stock, no evidence was furnished as to the preferred stock issued other than that preferred stock was issued

at a par value of $100 per share for the net tangible assets and the net tangible assets were shown to have been $901,692.27 at the date the petitioner was organized. Whether more preferred stock was issued between that date and March 3, 1917, we do not know. We do know that the amount issued as shown in our computation was issued at the organization of the petitioner and continued to remain outstanding through the years in controversy and we have accordingly determined the applicable limitation on that basis. In view of the foregoing, we are of the opinion that the good will allowable for invested capital purposes in the years covered by Docket No. 32980 is in the amount of $381,675.

The remaining issue arises in Docket No. 31397 and relates to the proper treatment to be accorded a net loss sustained by the petitioner in the 11-month period ended December 31, 1921, in determining its tax liability for the calendar year 1922. The petitioner was affiliated with four other corporations and filed consolidated returns with them for both of the aforementioned periods. In the 11-month period, the petitioner sustained a loss in the amount of $998,194.21, which both parties have treated as, and we understand to represent, a net loss. In the same period, each of the other corporations realized net income, the total for the four corporations being $717,392.40, thus resulting in a consolidated net loss in the amount of $280,801.81. In 1922 each member of the affiliated group had net income, that of the petitioner amounting to $147,349.21. The evidence is not entirely clear as to how the fractional period ended December 31, 1921, arose, though in the original petition the following allegation appears:

Prior to the year in question the corporation was on a fiscal year basis ending January 31st of each year. Prior to January 31, 1921 this Taxpayer applied permission to change from a *fiscal year* to a *calendar year* basis, which consent was granted. It filed its returns for the 11 months' period, which showed operating loss of $335,557.23 and pursuant to Section 204-b of the Revenue Act of 1921 it carried said loss forward and deducted it from the net income of the taxable year 1922. The Commissioner has erroneously disallowed this deduction on the ground that the preceding period was not a full period of 12 months.

The following answer was made to the foregoing allegation:

Respondent denies that he erred in disallowing an alleged operating loss of $335,557.23 for a fractional period of the year 1921. Respondent admits that the petitioner changed its accounting system from the fiscal year to the calendar year basis.

A reference to the change in accounting periods does not appear in the amended petitions and amended answers. The record shows,

however, that consolidated returns for the affiliated group were filed for the fiscal year ended January 31, 1921, the 11-month period ended December 31, 1921, and the calendar year 1922. No new corporations came into the group during the aforementioned period. We will accordingly proceed on the theory that the change which resulted in the filing of the return for the 11-month period ended December 31, 1921, was a voluntary change in accounting period in order that returns might thereafter be filed on a calendar year basis instead of on a fiscal year basis ending January 31.

In the arguments of the parties as set out in their briefs no reference is made to the effect, if any, on the allowability of the net loss because of the fractional period involved. The contention advanced by the petitioner is that the consolidated net loss for the 11-month period " should be set off against the net consolidated income of the succeeding period, without limitation." This argument is, of course, answered contrary to the petitioner's position by *Woolford Realty Co.* v. *Rose*, 286 U. S. 319; *Planters Cotton Oil Co.* v. *Hopkins*, 286 U. S. 332; *Swift & Co.* v. *United States*, 38 Fed. (2d) 365; *Delaware & Hudson Co. et al.*, 26 B. T. A. 520; and *Sailors Brothers Co.*, 26 B. T. A. 700. The Commissioner says that he has " computed the statutory net loss in accordance with the following rulings: G. C. M. 8132–IX–1 C. B.—287 and G. C. M. 8618–IX–2 C. B.—180 " and that his " method has been approved in the case of *Commissioner* v. *Ben Ginsburg Co.*, 54 Fed. (2d) 238." What, if anything, the Commissioner would allow on the basis of the foregoing rulings does not appear. While the deficiency notice makes no reference to net losses, and while there is nothing contained therein to indicate that anything has been carried forward to 1922 on account of the net loss sustained in the 11-month period ended December 31, 1921, it would appear from the above rulings that the Commissioner would now allow a part of the net loss sustained in the 11-month period in determining the petitioner's tax liability for 1922. In any event, we think it clear from the authorities set out under a discussion of the petitioner's position that, aside from the question arising because of the fractional period involved, the part of the unabsorbed net loss of the petitioner for the 11-month period ended December 31, 1921, in the amount of $280,801.81 which could be availed of by the petitioner in 1922 would be $147,349.21, its net income for 1922.

In view, however, of our consistent holding in many prior cases as to a net loss sustained in a fractional period, where such fractional period arises by reason of a voluntary change in accounting period, the petitioner may not avail itself, in determining its tax liability for 1922, of any of the net loss sustained in the 11-month period ended

December 31, 1921. That is, the Board has consistently held that a fractional period occasioned by a voluntary change in accounting period does not constitute a "taxable year" within the meaning of sections 200 and 204 (b) of the Revenue Act of 1921 and therefore a net loss sustained in such period may not be carried forward and deducted from the net income of the succeeding taxable year. *Arthur Walker & Co.*, 4 B. T. A. 151; *Dorsey Drug Co.*, 7 B. T. A. 229; *Strain Brothers, Inc.*, 19 B. T. A. 601; and *Stevenson Consolidated Oil Co.*, 23 B. T. A. 610. It accordingly follows that the claim of the petitioner for a deduction in 1922 on account of the net loss sustained in the 11-month period ended December 31, 1921, must be denied.

*Judgment will be entered under Rule 50.*